UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| MICHAEL L. ENGLISH,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:24-CV-178 JD |

## OPINION AND ORDER

Plaintiff Michael English applied for disability insurance benefits under Title II of the Social Security Act, alleging that he became disabled in April 2020. Mr. English's claims were rejected, leading to a review by an Administrative Law Judge ("ALJ"). After the Appeals Council denied Mr. English's request for review of the ALJ's decision, he appealed to this Court. For the reasons below, the Court will remand this case to the Agency for additional consideration.

### A. Standard of Review

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "The threshold for substantial evidence 'is not high.'" *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th

Cir. 2024) (quoting *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019)). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In evaluating the ALJ's decision, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Still the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant and the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). The ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

**B. Standard for Disability**

Disability benefits are available only to those individuals who can establish disability under the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). The claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step process to determine whether the claimant qualifies as disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v); 416.920(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the national economy.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step two, an impairment is severe if it significantly limits a claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1522(a), 416.922(a). At step three, a claimant is deemed disabled if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If not, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. §§ 404.1545, 416.945. The ALJ uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. §§404.1520(e), 416.920(e). A claimant qualifies as disabled if he or she cannot perform such work. The claimant has the initial burden of proof at steps one through four, while the burden shifts to the Commissioner at step five to show that there are a significant number of jobs in the national economy that the claimant can perform. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

### C. Discussion

**(1)** *The ALJ's Decision*

Mr. English filed a Title II application for disability insurance benefits alleging disability beginning April 19, 2020. His claim was denied initially and upon reconsideration, leading to a hearing before an ALJ on July 14, 2023.

At the hearing, Mr. English claimed, among other things, that his high blood pressure and the resulting migraines interfered with his ability to work. (R. at 54.) He told the ALJ that during a typical day he gets up, takes his dog outside and sits with her, and brings her back inside. (R. at 59.) At home, he surfs the web "or something like that . . . [i]f the medication doesn't have [him] knocked out." (*Id.*) He said he has no difficulties with self-care in terms of bathing, dressing, grooming those sort of things." (*Id.*) He lives alone and makes sure "things are picked up, dishes are done . . . sweeping, mopping, all those sort of things." (*Id*. at 60.) He doesn't have a working car so his mom takes him to the grocery store. He can "walk around the store and pick up the items . . . and put them in the cart." (*Id.*) He does yard work and can mow the lawn. (*Id.*)

In addition to answering questions from the ALJ, Mr. English was also questioned by his attorney. He said he's had health insurance for the past three years and has been able to get all his medications, including for managing his blood pressure. (R. at 62–63.) However, there was a time when he wasn't taking any medications for his blood pressure because the pharmacy was out of them due to COVID. (*Id.* at 63.) He monitors his blood pressure at home. His last reading was about 165 over 110, but over the previous three years, his readings had generally been higher than that, with systolic pressure above 200 (*Id*. at 63–64.) He testified that, when his blood pressure is that high, all he can do is lay down. (*Id*. at 64.)

4

On August 30, 2023, the ALJ issued a decision finding that Mr. English was not disabled. (R. at 37.) In doing so, the ALJ employed the customary five-step analysis. At Step 2, the ALJ determined that Mr. English suffered from the following severe impairments: "hypertension, generalized anxiety disorder, and major depressive disorder." (R. at 26.)

At Step 4, the ALJ determined Mr. English's residual functional capacity ("RFC"),[1] finding that he can

> perform light work[2] . . . except as reduced by the following. The claimant is limited to occasional climbing of ramps, stairs, ladders, ropes, and scaffolds and to frequently stooping, kneeling, crouching and crawling. He should avoid concentrated exposure to hazards, such as unprotected heights and moving mechanical parts. The claimant is further able to understand, remember, and carry out simple instructions and can have frequent interactions with coworkers, supervisors, and the public.

(R. at 29.)

In light of this RFC, the ALJ determined that there are jobs in significant numbers in the national economy that Mr. English can perform (collator operator, price marker, and routing clerk). (R. at 36.) The ALJ arrived at this conclusion after questioning a vocational expert at the hearing.

In her decision, the ALJ recognized that Mr. English did suffer many episodes of high blood pressure, some extreme, but found that clinical evaluations were otherwise unremarkable,

---

[1] "The RFC reflects 'the most [a person] can still do despite [the] limitations' caused by medically determinable impairments and is assessed 'based on all the relevant evidence in [the] case record.'" *Cervantes v. Kijakazi*, No. 20-3334, 2021 WL 6101361, at *2 (7th Cir. Dec. 21, 2021) (quoting 20 C.F.R. §§ 404.1545, 416.945(a)).

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567.

5

such as there were no findings of "acute distress," and Mr. English maintained "full orientation and appropriate mood/affect with normal judgment/insight." (R. at 27; *see also* R. 32–34 (able to walk one to two blocks, lift 25–30 pounds with each arm and 50 pounds with both arms; good eye contact, able to answer questions, and speak with normal volume/speed.) The ALJ largely attributed Mr. English's high blood pressure to his "non-compliance with salt intake/medication and confusion with medication instructions." (R. at 27.) The ALJ also noted that Mr. English told Dr. Greer that he had no health insurance and no money to obtain medications (*see* R. at 32 ("During a June 6, 2022, physical consultative exam, the claimant reports no use of medications for one year [due to having no insurance or money to obtain medication] . . . ."), but testified at the hearing that he had health insurance over the time period in question (*id*.) In addition, according to the ALJ, "it did not appear that [Mr. English] attempted to access medications through any number of medical care support groups." (R. at 32 (citing R. at 325.) The ALJ also noted that one of his doctors had contacted the pharmacy several times, only to learn that the prescribed medication had been filled but remained uncollected for several weeks. The ALJ observed that, after Mr. English's medication was converted to a ninety-day prescription, his compliance improved, resulting in lower blood pressure readings. (R. at 27.) Mr. English's most recent blood pressure reading was 165/110, which was an improvement from prior readings, with Mr. English stating that "new medications have helped." (R. at 34.)[3]

---

[3] A note on citing the record: both the ALJ and the Commissioner include multiple citations to the record, which is commendable. However, they are difficult to navigate. They lack parentheticals explaining their relevance and typically follow sentences that reference multiple medical conditions, making it unclear which proposition each citation supports. (*See, e.g.*, ALJ's Decision, R. at 27, 30, 33–34; Def.'s Resp., DE 16 at 4, 6.) In turn, the cited pages—sometimes spanning as many as eight in a row—often list multiple conditions as well, so the Court is left largely on its own to determine whether a citation actually supports the ALJ's decision or the Commissioner's arguments. The Court is mindful of the time constraints involved in disability litigation under the Social Security Act, but citations that lack clarity do not meaningfully assist the Court.

Similar to her findings about hypertension, the ALJ determined that the intensity and persistence of Mr. English's migraines were unsupported by the overall medical record, and, to the extent that they were related to his hypertension, their occurrence appeared to result from Mr. English's failure to comply with his medication regimen.

Finally, the ALJ found that Mr. English has "some level of depression," which appeared to have been more pronounced before September 2021 (R. at 34). Since then, according to the ALJ, clinical findings have been minimal and unremarkable.

Overall, the ALJ concluded that Mr. English's allegations and testimony regarding the severity of symptoms and level of dysfunction weren't persuasive. (*Id.* at 34–35)

**(2)** *The ALJ's Credibility Finding*

In his appeal, Mr. English argues that the ALJ committed reversible error by failing to consider whether he had an acceptable reason for not complying with his prescribed blood pressure medication regimen. He contends that this failure tainted the ALJ's evaluation of his claims of high blood pressure and resulting migraines. Of the several arguments Mr. English raises on appeal, this is the most substantive and warrants remand for further consideration. As a result, the Court will address this argument and decline to reach the remainder.

The Court "will uphold an ALJ's credibility determination unless that determination is 'patently wrong.'" *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022) (quoting *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015)).

> Social Security Ruling 16-3p explains factors to consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms. 2017 WL 5180304 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529. Notably, ALJs "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2017 WL 5180304 at *11. Instead, ALJs should "focus on whether the evidence establishes a medically

7

>determinable impairment that could reasonably be expected to produce the individual's symptoms and . . . whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id*.

*Id*. at 653–54.

Even though the review is highly deferential, "an ALJ still must competently explain an adverse-credibility finding with specific reasons 'supported by the record.'" *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015) (quoting *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). "'An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding.'" *Id*. (quoting *Pierce v. Colvin*, 739 F.3d 1046, 1051 (7th Cir. 2014)).

A claimant who does not follow prescribed treatment without good reason will not be found disabled if the treatment is expected to restore the ability to work. *See* 20 C.F.R. § 404.1530(a)–(b). An ALJ must be careful, however, not to draw negative inferences from a claimant's lack of treatment without first exploring the reasons for that inaction. *Ray v. Berryhill*, 915 F.3d 486, 490–91 (7th Cir. 2019). They must not "find an individual's symptoms inconsistent with the evidence in the record [due to apparent inconsistency between symptoms and treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3p at *9 (S.S.A. Oct. 25, 2017). Instead, an ALJ "may need to . . . ask why [the claimant] has not complied with or sought treatment in a manner consistent with his or her complaints." *Id*.

Among things that an ALJ may consider when evaluating the claimant's treatment history is his or her ability "to afford treatment" and whether they "have access to free or low-cost

8

medical services." *Id*. at *10. According to Social Security Ruling 18-3p, an inability to afford prescribed treatment and incapacity are good reasons for noncompliance:

> Cost: The individual is unable to afford prescribed treatment, which he or she is willing to follow, but for which affordable or free community resources are unavailable. Some individuals can obtain free or subsidized health insurance plans or healthcare from a clinic or other provider. In these instances, the individual must demonstrate why he or she does not have health insurance that pays for the prescribed treatment or why he or she failed to obtain treatment at the free or subsidized healthcare provider.
>
> Incapacity: The individual is unable to understand the consequences of failing to follow prescribed treatment.

Soc. Sec. Ruling 18-3p, Titles II & XVI: Failure to Follow Prescribed Treatment, SSR 18-3p at *5 (S.S.A. Oct. 2, 2018).

\* \* \* \* \*

The ALJ had no difficulty acknowledging that Mr. English had a history of extremely high blood pressure readings. However, the ALJ discounted the impact of Mr. English's high blood pressure, especially as related to the alleged migraines. The ALJ found that allegations of migraines caused by hypertension were not supported by sustained clinical findings:

> Likewise, allegation for migraine headaches caused by hypertension occurring two to three times a week since alleged 2020 disability onset are not met with sustained [review of systems] reports for headaches nor clinical findings consistent with nor supportive of severe sustained migraines including no acute distress, full orientation and appropriate mood/affect with normal judgment/insight.

(R. at 27.)

Also, the ALJ observed that, despite elevated blood pressure, clinical exam findings were generally within normal limits, and the claimant's testimony indicated improvement with new medications:

> Other than significantly elevated blood pressure, the claimant alleged an ability to walk one to two blocks, stand 20 to 30-minute, climb 10 stairs, lift 25 to 30-pounds with each arm and 50-pounds with both arms, and overall clinical exam findings were unremarkable for significant deficits. Such clinical findings included no acute distress, full orientation, good eye contact, ability to answer all questions, and speak with normal volume/speed. The claimant was without edema or muscle spasms or pulmonary deficits, and New York Heart Association (NYHA) assessment was for class II (i.e. slight limitation of activity possibly due to fatigue/palpitation/dyspnea/angina), which again occurred within context for no use of blood pressure medication in a year and for blood pressure of 249/158.

(R. at 32 (discussing June 6, 2022, consultative exam); *see also* R. at 33 (same observations from July 27, 2022, visit at the Bowen Center); R. at 34 ("In addition, clinical mental status exam findings/observations during August 2021 and June 2022 physical consultative exams and November 8, 2022, E/R visit for elevated hypertension, likewise did not support significant deficits including, no acute distress, full orientation and cooperative presentation.") (citations to the record omitted); R. at 34 ("The claimant testified that his most recent blood pressure reading was 165/110, which was an improvement from that within the medical record, and he also stated that new medications have helped.")

Besides contrasting the objective evidence related to high blood pressure and migraines with Mr. English's allegations, the ALJ also discounted Mr. English's subjective complaints based on his failure to follow prescribed treatment. For example, the ALJ observed that his worst blood pressure readings occurred primarily during a period when he was not taking his prescribed medications. The ALJ appears to have inferred—without further inquiry—that, aside from confusion with medication instructions, Mr. English lacked a valid reason for noncompliance and accordingly discounted his testimony regarding the resulting migraine headaches. (*See* R. at 27 ("Rather, with some consistency reports of hypertension are the result of non-compliance with salt intake/medication and confusion with medication instructions . . . .").) She made the same inference regarding a June 2022 consultative exam, where Mr. English

presented with a blood pressure of 249/158 but "refused evaluation in the E/R for extremely high blood pressure." (R. at 31–32.) Next, the ALJ noted that Mr. English did not return to the Bowen Center for nearly a year after an initial visit in August 2021, and faulted him for not attempting to access medications through medical care support groups during that time. (R. at 31–32.) Yet at no point did the ALJ ask Mr. English to explain these gaps in seeking treatment, failing to take medication, or refusing to go to the ER. The ALJ's repeated negative inferences—drawn without exploring whether Mr. English had good cause for noncompliance—constitute reversible error. *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. An ALJ may need to question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. The claimant's "good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects.") (citations and quotation marks omitted).

As already noted, "an erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Engstrand*, 788 F.3d at 660. Neither condition is met here. Moreover, the Court cannot say that the ALJ's error is harmless. An error is harmless if, upon examination of the record, the reviewing Court can "predict with great confidence what the result of the remand will be." *Wilder v. Kijakazi*, 22 F.4th 644, 654 (7th Cir. 2022). The Court cannot reach such a conclusion here, especially because there's evidence suggesting that Mr. English had difficulty paying for medications and his lapses may have been caused by mental health-related limitations.

11

Mr. English did not receive medical care for his high blood pressure between August 2021 and June 2022. At his June visit, he told Dr. Greer that he had not taken blood pressure medication for over a year, explaining that he had no money. Dr. Greer documented the visit as follows:

> High blood pressure: currently not taking any medications. Hypertensive Urgency with BP >180/110. He states that he does not have money to get medications. Recommended Local Treasurer for prescription support, Matthew 25 or Neighborhood Health Clinic for medical care support. He does not have a PCP. He has not been on medications for 1 year. He does not have any insurance.

(R. at 325.) Further, at a July 2022 visit, Mr. English's mother informed the doctor that he was experiencing depression, often stayed in bed until he got better, some days wouldn't leave the house, and was highly reluctant to seek treatment (R. at 476). On remand, although the ALJ does not have to conclude that Mr. English's financial hardship or experience of depression kept him from seeking or following prescribed treatment, the ALJ must ask Mr. English to explain his reasons for not doing so.[4]

The Commissioner argues that the ALJ's negative inference from Mr. English's failure to follow prescribed treatment was not the only basis upon which the ALJ relied in finding that he was not disabled. The Commissioner points to Mr. English's somewhat unremarkable doctor

---

[4] In her decision, the ALJ considered salt intake, presumably something that Mr. English can control, as an additional contributing factor to Mr. English's high blood pressure. (*See* R. at 27.) While the medical records indicate that Mr. English was advised to limit his salt intake (*see* Office Visit Notes from July 1, 2019, R. at 282; Sept. 30, 2019, R. at 278) and that he "[d]oes not watch salt intake" (Office Visit Notes from October 10, 2022, R. at 455), the ALJ has not indicated on what source she's relying to base her conclusion. On remand, the ALJ should base any such finding on medical expert opinions, so as to avoid "playing doctor." *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("The Commissioner's determination must be based on testimony and medical evidence in the record. And, as this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

examinations, his daily activities, and the reviewing expert's opinion. But these findings must be considered together with Mr. English's subjective allegations, and the ALJ wrongly relied on the gaps in treatment to discount them without first hearing from Mr. English. Subjective allegations are important here and intertwined with the rest of the evidence because, even when there is a lack of objective medical evidence to substantiate the severity of the pain, an ALJ may not discredit a claimant's testimony solely on that basis. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) ("[T]he ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it."). Likewise, the expert's opinion is largely based on objective evidence which, again, is insufficient by itself to disprove Mr. English's allegations. And the evidence of Mr. English's daily activities is not so one-sided that it would override his subjective complaints of pain.

In addition, the three cases on which the Commissioner relies are readily distinguishable. The first, *Zellweger v. Saul*, 984 F.3d 1251, 1252 (7th Cir. 2021), does not even concern a plaintiff who failed to follow a prescribed treatment. Rather, in that case, the plaintiff claimed that his spinal disorder was equivalent to Listing 1.04, but the ALJ disagreed. On appeal, the primary issue was whether the ALJ's decision was too cursory and whether the *Chenery* doctrine applied. The Court of Appeals explained that nothing in *Chenery* prohibits a reviewing court from considering an ALJ's decision holistically, including elaborations and analyses appearing elsewhere in the decision. *See Zellweger v. Saul*, 984 F.3d 1251, 1254 (7th Cir. 2021) ("The sole issue in this case is whether the magistrate judge correctly applied the Chenery doctrine. He did not. Chenery generally confines a reviewing court to the agency's actual rationale for its decision, not an after-the-fact justification. As we recently explained in *Jeske*, however, nothing in Chenery prohibits a reviewing court from reviewing an ALJ's step-three determination in light of

elaboration and analysis appearing elsewhere in the decision.") (citations omitted). In short, *Zellweger* is not controlling.

In *McKinzey v. Astrue*, 641 F.3d 884 (7th Cir. 2011), "the ALJ did not explain why she discounted plaintiff's facially valid reason for declining surgery, namely that her physicians did not agree that it would necessarily help, and could even hinder." *Id*. at 890. The Court of Appeals found that while the ALJ's articulation was deficient in some respects, the decision was supported by substantial evidence because the record included evidence strongly suggesting that claimant exaggerated symptoms and limitations even to her own doctor. *Id*. at 891. No comparable evidence exists in Mr. English's case.

Finally, the district court in *Phillip R. v. Kijakazi*, No. 1:21-CV-1068, 2022 WL 4125896 (S.D. Ind. June 21, 2022), found that the ALJ's silence on possible reasons for plaintiff's noncompliance was problematic, but plaintiff conceded his argument that the ALJ identified two other valid grounds for the decision. *Id*. at *5.

The Court finds that the ALJ erred in her credibility assessment, and that as a result, the credibility finding is not supported by substantial evidence. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) (stating that "the ALJ was required by Social Security Rulings to consider explanations for instances where [the plaintiff] did not keep up with her treatment"); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (similar); SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."). While the Commissioner, in opposing Mr. English's appeal, contends that the ALJ properly evaluated his medical records and

daily activities, the Commissioner offers no explanation for the ALJ's failure to ask Mr. English to explain the gaps in seeking treatment, failing to take medication, or refusing to go to the ER before drawing negative inferences about his credibility.

### D. Conclusion

For these reasons, the Court REVERSES the Agency's decision and REMANDS this matter to the Agency for further proceedings consistent with this opinion. The Clerk is directed to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: May 27, 2025

                                                  /s/ JON E. DEGUILIO  
                                                  Judge  
                                                  United States District Court